# In the United States Court of Federal Claims

No. 13-982C

(E-Filed:  March 20, 2014)[1]

| | |
|---|---|
| CMI MANAGEMENT, INC., | Pre-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; Challenge to Offeror's Exclusion from the Competitive Range; Challenge to Technical Evaluation Committee Findings and Business Evaluation Committee Findings; Disparate Treatment |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

<u>Jerry Alfonso Miles</u>, Rockville, MD, for plaintiff.

<u>Scott R. Damelin</u>, with whom were <u>Stuart F. Delery</u>, Assistant Attorney General, <u>Bryant G. Snee</u>, Acting Director, and <u>Steven J. Gillingham</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  <u>Barbara L. Walthers</u>, Office of the Chief Counsel, United States Citizenship and Immigration Services, United States Department of Homeland Security, Washington, DC, of counsel.

<u>OPINION AND ORDER</u>

**CAMPBELL-SMITH, Chief Judge.**

     CMI Management, Inc. (CMI or plaintiff) filed a pre-award bid protest, challenging its exclusion from the competitive range for a contract award to perform Field Office Support Service (FOSS) for the U.S. Citizenship and Immigration Services (USCIS or the Agency) under the Department of Homeland Security (collectively, the government or defendant).  Compl. ¶ 5, ECF No. 1.  The parties submitted cross-motions

---

[1]    This Opinion was filed under seal on March 7, 2014, ECF No. 18.  The court instructed the parties to file any requests for the redaction of protected material on or before March 14, 2014.  <u>Id.</u> at 1, n.1.  Neither party has proposed redactions.  Accordingly, this opinion is published without redactions but with the corrections requested by defendant.  <u>See</u> Def.'s Notice of Proposed Corrections, filed Mar. 11, 2014, ECF No. 20.

for judgment on the administrative record in accordance with United States Court of Federal Claims Rule (RCFC) 52.1(b).[2] See Pl.'s Mot. JAR & Mem. JAR (collectively, Pl.'s Mot.), ECF Nos. 14, 14-1; Def.'s Mot. JAR (Def.'s Mot.), ECF No. 15. The court finds that the government's decision to exclude CMI from the competitive range was rational and not arbitrary, capricious, an abuse of discretion or contrary to law under 28 U.S.C. § 1491(b)(4) (2012); accordingly, CMI's motion is DENIED and defendant's motion is GRANTED.

I.    Background

USCIS issued a Request for Proposals (RFP or the solicitation) HSSCCG-13-R-00002 on March 4, 2013, as amended March 18, 2013 and July 12, 2013, to provide FOSS to the Field Office Directorate and the Fraud Detection and National Security Directorate at sixty-eight of the eighty-six USCIS Field Offices and ten USCIS Asylum Offices throughout the United States. See Admin. R. (AR) 52–350 (RFP); AR 351–521 (RFP Amendment 1); AR 522–54 (RFP Amendment 2); see also AR 1890–1906 (Contracting Officer's Statement of Facts). A successful offeror would furnish all personnel, materials, services and facilities necessary to perform tasks set forth in the RFP, including:  correspondence management, file operations and maintenance, data system activities, administrative support, interview scheduling, certificate production, administrative and judicial ceremony support, fraud detection and national security support, and file retirement. AR 82–96. The resulting award would offer a hybrid contract consisting of a Firm-Fixed-Price and Time and Materials pricing strategy, for one base period and five option periods (totaling sixty months). AR 79.

The RFP required submissions in two volumes. AR 154. To be addressed in the submitted technical proposal (volume one) was the offeror's Management Capability (Factor One), as determined by four subfactors:  (1) Operational Approach; (2) Staffing; (3) Management Approach; and (4) Relevant Corporate Experience. AR 154–58. To be addressed in the submitted business proposal (volume two) was the offeror's Small Business Subcontracting (Factor Two), as determined by three subfactors:  (1) Maximization of Small Business Opportunities; (2) Participation in the Department of Homeland Security (DHS) "Mentor-Protégé Program;" and (3) "Small Disadvantaged Business Participation Program - Targets." AR 160-62. Also to be addressed in the business proposal were the offeror's Past Performance (Factor Three) and Price (Factor Four). AR 163–67.

The RFP sought the "Best Value" for the government in accordance with the "tradeoff process" set forth in Federal Acquisition Regulation (FAR) § 15.101-1, codified at 48 C.F.R. 15.101-1 (2013). See AR 173 (RFP) (explaining evaluation process). Each

---

[2]    The government filed the administrative record (AR) under seal on January 2, 2014 in the form of a CD-ROM. See Def.'s Notice of Filing Admin. R., ECF No. 13.

offeror's proposal was to be evaluated against the four factors and their subfactors, listed in descending order of importance.  Id.  Management Capability (Factor One) was the most important factor.  See id.  With respect to the other factors, all of the "non-price factors when combined"—(1) Management Capability, (2) Small Business Subcontracting, and (3) Past Performance—were "significantly more important than the Price factor [(4)]."  Id.

The Management Capability and the Small Business Subcontracting factors, and their subfactors, were "rated using [the] adjectival ratings:  Outstanding, Good, Acceptable, Marginal and Unacceptable."  AR 175, 178; cf. AR 178 (permitting an additional Neutral rating for Small Business Subcontracting).  The Past Performance factor was rated according to the assessed risk:  "Low Risk, Medium Risk, High Risk, and Neutral."  AR 180.  Lastly, the Price factor focused on the offeror's hybrid pricing schedule (a mix of Firm-Fixed-Price and Time and Materials contract line items) and was evaluated for reasonableness in light of the business matters of the proposal.  AR 181.  The RFP allowed the Agency to determine the competitive range without discussions.  AR 182.  The RFP permitted, but did not require, the Agency to conduct later discussions with offerors in the competitive range.  Id.

The Source Selection Plan for the FOSS solicitation was issued on March 21, 2013, AR 555–90 (Source Selection Plan), and detailed the establishment of a Technical Evaluation Committee (TEC) and a Business Evaluation Committee (BEC), each bearing respective responsibility for evaluating the technical and business proposals.  AR 561.

CMI timely submitted a proposal in response to the RFP, containing both a technical volume and a business volume, dated April 1, 2013.  AR 591–726 (CMI technical proposal), 727–896 (CMI business proposal); see also AR 897–1403 (detailed pricing spreadsheets); 1404 (USCIS receipt acknowledgement).  Ten days later (after the solicitation deadline), CMI also submitted its "Mentor-Protégé program" approval letter dated April 11, 2013, AR 1405–06 (cover email and approval letter), for Agency consideration under the solicitation's Small Business Subcontracting inquiry (Factor Two, Subfactor Two).  Six offerors, including CMI, submitted proposals.  AR 1891.

Between April and June, the TEC and the BEC evaluated the six submitted proposals.  AR 1891.  The committees' evaluations resulted in the issuance of four reports on June 27, 2013.  See AR 1407–89 (TEC report, Management Capability), 1508–50 (BEC report, Small Business Subcontracting), 1559–1604 (BEC report, Past Performance), 1672–1707 (BEC report, Pricing).  With respect to the first factor (Management Capability), the TEC evaluators identified each offeror's Strengths, Weaknesses, Significant Weaknesses and Deficiencies.  See AR 1414 (defining terms).  The evaluators then converted their assessments of strengths and weaknesses to adjectival ratings for each of Factor One's four subfactors, and ultimately for Factor One itself.  See AR 1414–15 (defining adjectival ratings).  The BEC evaluators engaged in a similar assessment of strengths and weaknesses for the second factor (Small Business

Subcontracting).  See AR 1510–15.  For the third factor (Past Performance), the BEC evaluators assessed a risk level for each offeror.  See AR 1560-61 (defining risk level).  Lastly, for the fourth factor (Price), the BEC reviewed each offeror's price proposal for compliance with pricing instructions, verified amounts, and established pricing schedules.

On June 27, 2013, the contracting officer (CO) issued her competitive range determination based on her review of the six offerors' proposals and the evaluation reports, as well as discussions with the evaluators.  AR 1819–27 (Competitive Range Determination).  The competitive range consisted of two of the six offerors (USIS and FCi), and excluded the remaining four (including CMI).  AR 1820.  The CO explained that the two successful offerors scored the highest on the most important Factor One (Management Capability), receiving either Good or Outstanding ratings, and otherwise their proposals suffered from only "minor . . . weaknesses and pricing concerns" that could "be corrected through discussions without requiring a major rewrite of their proposals."  AR 1820.  In contrast, three of the four excluded offerors (including CMI) scored merely Acceptable on overall Management Capability and the remaining offeror scored Unacceptable.  AR 1821, 1823.  The CO determined that CMI and the other excluded offerors "would need to make significant changes to their technical or business proposals, or both, to become competitive, and given the technical superiority of the . . . proposals [of the two offerors in the competitive range (USIS and FCi)], would still not be likely to receive the award."  AR 1823.

On July 11, 2013, the CO notified CMI that its proposal "ha[d] been eliminated from the competitive range and that no discussions [would] be held regarding [CMI's] offer nor [would] any proposal revisions be considered."  AR 1829; see generally AR 1828–56 (Debrief Letter).  The Agency rated CMI as follows:

| | |
|---|---|
| Factor 1:  Management Capability | Acceptable |
| Subfactor 1:  Operational Approach | Acceptable |
| Subfactor 2:  Staffing | Acceptable |
| Subfactor 3:  Management Approach | Good |
| Subfactor 4:  Relevant Corporate Experience | Acceptable |
| | |
| Factor 2:  Small Business Subcontracting | Marginal |
| Subfactor 1:  Maximization of Small Business Opportunities | Marginal |
| Subfactor 2:  Participation in the DHS Mentor-Protégé Program | Marginal |
| Subfactor 3:  Small Disadvantaged Business Participation Program | Acceptable |
| | |
| Factor 3:  Past Performance | Low Risk |
| | |
| Factor 4:  Price | $223,057,116.51 |

AR 1820-23; Compl. ¶ 22.  The CO found that "CMI's technical approach appear[ed] to be a step backward and would negate beneficial changes that have been made in FOSS

operations since CMI was the [Record Support Services (RSS)] contractor" more than three years ago. AR 1824. On the business side, CMI had the third lowest price under Factor Four; however, with respect to Factors Two and Three, the Agency found that CMI failed to submit a portion of the requisite information, which reportedly left the BEC unable to complete portions of its evaluation. AR 1825 (discussing missing information).

On July 16, 2013, CMI timely filed a bid protest with the Government Accountability Office (GAO), protesting its exclusion from the competitive range. See AR 1864–89 (GAO Protest). The Agency, in turn, moved to dismiss or deny the protest. AR 1907–13 (Mem. P. & A. to GAO filed Aug. 12, 2013); see AR 1890–1906 (CO's Statement of Facts). On November 8, 2013, the GAO denied the protest. AR 1941–50 (GAO Protected Decision).

CMI then filed its complaint in this court, alleging the Agency acted arbitrarily, capriciously and unreasonably when it excluded CMI from the competitive range. Compl. ¶¶ 23–26; see also Pl.'s Mot. 1. Asserting that "[a] reasonable evaluation of the non-price factors, would have resulted in a higher overall rating of CMI's proposal and CMI's inclusion in the competitive range," Compl. ¶ 23; see also Pl.'s Mot. 5, CMI argues that the Agency's findings were not supported by, and often were directly contradicted by, the administrative record. Pl.'s Mot. 5. The parties disagree on the ratings CMI received for its Operational Approach, Staffing, Management Approach, and Relevant Corporate Experience (Factor One, Subfactors One through Four), as well as its rating for Participation in the Mentor-Protégé Program (Factor Two, Subfactor Two). The parties also disagree on whether (i) CMI suffered disparate treatment in its ratings relative to those received by the other offerors; and (ii) whether CMI suffered undue prejudice because of its exclusion from the competitive range. For context, the court next sets forth, in detailed sequence, each of the issues raised by CMI.

II.   The Parties' Arguments

A.   Technical Proposal – Factor One, Subfactor One: Operational Approach

CMI contends that the Agency erred in ranking its Operational Approach under Management Capability (Factor One, Subfactor One) Acceptable, rather than Outstanding or Good. Pl.'s Mot. 5–16, 24–35 (arguing error); but cf. AR 1428 (Agency rating and discussion); Def.'s Mot. 7-10 (defending rating).

For this subfactor, the RFP directed each offeror to address its "daily operations," in particular its approach to daily operations; how it would maintain operations consistent with contract requirements; why the offeror's approach would be "workable and realistic;" and how its approach might vary at various sites. AR 154-55; see also AR 1411 (TEC report) (restating similar).

In support of the Acceptable rating given to CMI, the Agency noted that CMI's "sound management structure, robust career development and cross-training program, and deployment of the performance/production tracking tool combined to make [CMI's proposal] a workable/viable operational approach that result[ed] in a high probability that [CMI could] manage this contract with success." AR 1429. The Agency also identified two strengths: (1) CMI's approach to employee retention and training; and (2) its Employee Performance Tracking System (EPTS). AR 1429-30. Despite these strengths, the Agency declined to rank CMI as either Outstanding or Good based on its finding that CMI's proposal also suffered from two weaknesses. AR 1430-31. First, the Agency interpreted CMI's suggestions for improvement to FOSS operations to be outdated and reflective of the offeror's inadequate appreciation for how FOSS operations had changed since the expiration of CMI's prior RSS contract three years earlier. AR 1430. Second, the Agency criticized CMI for parroting the RFP requirements without addressing how it would perform the requirements. AR 1430-31.

CMI offers four reasons why the identified weaknesses constitute Agency error. See Pl.'s Mot. 6–10.

### 1.   "Records Management Technician" (RMT) Terminology

The first weakness identified by the Agency was based partly on a finding that CMI used "outdated labor category terms (e.g., RMT)." AR 1430. The government contends that although "CMI's technical proposal includes the acronym RMT and [an] accompanying definition . . . (AR 601), . . . CMI repeatedly refers to RMTs throughout its proposal without any indication the reference is to a training program rather than a labor category." Def.'s Mot. 33 (citing, e.g., AR 621–24 of CMI's technical proposal).

CMI responds that the administrative record shows differently. CMI claims that the AR establishes: (i) the Agency understood RMT was a training program (not a labor category), and deemed the RMT a strength under this same Operational Approach subfactor, Pl.'s Mot. 9, 27 (citing, e.g., AR 1833, 1834, 1840); (ii) CMI's technical proposal explains that RMT is a training program to cross-train its employees to improve efficiencies and facilitate workflow adjustments, Pl.'s Mot. 9-10 (citing AR 627, 631, 635, 642, 643, 647–701); and (iii) CMI never referred to RMT as a labor category in any of its submissions, Pl's Mot. 10. In addition, CMI argues that Figure 2 of its business proposal clearly "cross-walks" CMI's internal RMT classification system with recognized Department of Labor (DOL) and Collective Bargaining Agreement (CBA) categories. Pl.'s Mot. 10; see AR 787 (Figure 2) (including footer stating, "[c]rosswalk connecting CMI's labor categories/titles to those used in the FOSS solicitation and those

used by [DOL] and CBAs for wage determinations"). Thus, CMI asserts, there is no rational basis for the government's alleged confusion.[3]

### 2.    Improvements or Best Practices

The Agency also faulted CMI's Operational Approach for allegedly leaving unexplained some of its "recommendations to improve existing processes." AR 1430.

The Agency noted that CMI advocated adopting color-coded sorting and pitching bins and color-coded delivery mail pouches, AR 623, but failed to "provide evidence of how quality [would] be improved [for the Agency] . . . by using this method," AR 1430. As a result, the Agency determined it was unable to assess whether the suggested improvement offered the alleged benefits. AR 1430.

CMI counters that it offered color-coding not as an improvement but merely as an acknowledgement of a "best practice" identified under its other contracts. Pl.'s Mot. 10–12, 30–32. If awarded the contract, it then intended to assess whether and how to implement the process for the FOSS contract. See Pl.'s Mot. 11. In any event, CMI asserts that it sufficiently spelled out the benefits of color-coding when it explained, in its proposal, that color-coding "'has proven to improve process quality and reduce processing time.'" Pl.'s Mot. 10 (quoting AR 623 in CMI's technical proposal). CMI also challenges the Agency's finding that its proposal was missing a dollar-based analysis of the cost of implementing color-coding. Pl.'s Mot. 11 (referring to AR 1835, in which the Agency found "[a]nalysis of how the initial cost of purchasing color-coded bins and pouches . . . should have been provided so that the government could determine if a benefit exists"); see also Pl.'s Mot. 30–32 (similar arguments). CMI asserts that such an analysis would have been impossible to compile pre-award and the solicitation did not require it. Pl.'s Mot. 11.

Similar to its complaints about CMI's color-coding discussion, the Agency also criticized CMI for proposing that it would collect Notices of Naturalization without explaining why doing so would be efficient and cost-effective. AR 1835. CMI maintains that this too was a "best practice;" and, to an extent might also have been a suggested improvement, but its proposal for such collection was intended simply to convey that it would take corrective action to find and replace missing certificates. See Pl.'s Mot. 11–12, 30–32.

---

[3]    CMI also argues that the Agency provides "no rational explanation of how the use of an internal title or category could be 'outdated' as alleged by the Agency, and thus considered a weakness." Pl.'s Opp'n Def.'s Mot. JAR (Pl.'s Opp.) 7 n.4, ECF No. 16.

### 3.     New and Innovative Improvements

CMI challenges the Agency's finding that it lacked a "firm grasp on changes that have occurred since its previous contract," because it was deemed to have suggested outdated improvements and best practices that were neither "new" nor "innovative."  Pl. Mot. 10-14; see also AR 1430 (TEC report) (faulting CMI for suggesting it would insert Notices of Naturalization into files, coordinate audit activities, and require FBI identification records (RAP) sheets).  CMI responds that it is unaware "of any major changes to processes" in the three years since it had the RSS contract, and "[i]f there have been any major changes, the RFP did not reveal them." Pl.'s Mot. 31; see also AR 621 (technical proposal) (stating CMI was not aware of changes in processes).  CMI argues that the Agency erred because FAR §15.305(a) does not permit the Agency to find a weakness based on "unstated evaluation criteria."  Pl.'s Opp'n Def.'s Mot. (Pl.'s Opp.) 7–8, ECF No. 16; cf. FAR § 15.305(a) (stating an agency's evaluation shall be based "solely on the factors and subfactors specified in the solicitation").

### 4.     Methodology to Daily Operations

The Agency based CMI's second weakness on a finding that CMI failed to "articulate a plan" for its Operational Approach; instead, CMI merely cut and pasted the RFP requirements into its proposal.  AR 1835; see AR 1431.  CMI admits that it repeated some language from the RFP "to guid[e] the reader, organiz[e] the proposal, and ensur[e] that the proposal demonstrated compliance with minimum requirements."  Pl.'s Mot. 32.  CMI contends that beyond the recognizeable RFP text, its submitted "[p]roposal contains much more information and detail,"  Pl.'s Mot. 32; see also Pl. Mot. 15–16, about EPTS, Access mail manifest system, interfiling methods, frequent audits, and standardized Responsible Party Code (RPC) sections for audits.  Pl.'s Mot. 32–34; see also Pl.'s Opp. 4 (listing similar examples).

CMI avers that it deserved credit for its past, successful performance on other, similar contracts because its experience and success serve as reasonable indicators that its application of the same operational approach to the FOSS contract would yield a comparable outcome.  Pl.'s Mot. 34–35.  By way of example, CMI points to the 99% acceptable quality level (AQL) it received for the six consecutive years it performed the prior USCIS RSS contract.  AR 611.  CMI claims that its previous high level of performance should have been "a logical indicator that [it] would perform at similar quality levels in the future," Pl.'s Opp. 4.

### B.     Technical Proposal – Evaluation of Factor One, Subfactor Two:  Staffing

The Agency rated CMI's approach to Staffing (Factor One, Subfactor Two) Acceptable.  AR 1431.  This subfactor analyzed the offeror's ability to meet or exceed requirements concerning key personnel, recruitment and retention of a quality workforce, retention efforts unique to small offices, and corporate organizational structure.  AR 155

(RFP requirements); see also AR 1411–12 (TEC report) (restating similar).  CMI was praised for two strengths:  (1) its "[k]ey [p]ersonnel" were determined to be "well-qualified and [to] have specific, proven, history/experience with USCIS that [would] allow an immediate and smooth transition period" and inspire government "confidence;" and (2) its "holistic approach to recruitment" and its cross-training and career development plans for retention were found to maximize the likelihood of a "well-skilled staff."  AR 1432.

At the same time, the Agency criticized CMI for "not provid[ing] the required justification for staffing levels, skills mix or labor categories," and instead pointing summarily to its past success in staffing other projects.  Id. (Weakness 1).  The Agency found that CMI failed to explain the similarities between the prior contract and the FOSS contract at hand and thus its prior success failed to elicit the requisite government confidence.  See id. (reiterating its dissatisfaction with CMI's alleged use of RMT as a labor category).  The Agency also faulted CMI for "developing a staffing plan based on its experience and history with the former [RSS] contract instead of using the workload presented in the RFP."  AR 1432 (Weakness 2).  Moreover, the Agency expressed concern that CMI's use of data from a contract other than the FOSS contract "could result in inappropriate staffing levels and, thereby, provide the government with overstaffing or understaffing."  AR 1433.

CMI responds that neither of the weaknesses identified by the Agency is justified.  Pl.'s Opp. 8.  CMI asserts that discussing its own direct experience on a nearly identical, prior contract is reasonable and cannot be considered a weakness.  Pl.'s Opp. 8.  It adds that, although it used data from its prior contract as a starting point, it ultimately based its proposed staffing levels for this FOSS contract on the workloads contemplated in the solicitation.  Pl.'s Opp. 8 (quoting its technical proposal at AR 647) ("We based staffing levels on historic average workloads and our experience . . . [as] required to ensure Performance Requirements [would be on] par meeting or exceeding AQLs."); see also AR 788 (CMI business proposal) (stating CMI had "compared production levels when [it] ran [its data from] the [prior] RSS program to production volumes provided in the [FOSS] RFP" in order "to see which sites remained the same as a reasonableness test for staffing quantities and labor mix").  Arguing that it should not be faulted, again, for the Agency's misunderstanding of the RMT terminology, Pl.'s Opp. 8, CMI claims that it merited a higher Staffing rating than Acceptable.[4]  Pl.'s Opp. 8–9.

---

[4]      CMI did not challenge the Acceptable Staffing rating in its motion; the government raised the issue of Staffing in its cross-motion and opposition to CMI's motion, to which CMI responded.  See Def.'s Mot. JAR (Def.'s Mot.) 10–11, ECF No. 15; Pl.'s Opp. 8–9.

C.     Technical Proposal – Evaluation of Factor One, Subfactor Three:
       Management Approach

CMI argues that the Agency should have rated CMI's Management Approach
(Factor One, Subfactor Three) Outstanding—rather than Good—based on the Agency's
finding of five significant strengths and one weakness.  CMI asserts that the one
identified weakness is not supported.  Pl.'s Mot. 16–17, 25; see also AR 1433, 1436–37
(TEC report) (stating the Agency's rationale for assigning CMI a Good rating).

The RFP required offerors to describe their "approach to managing non-exempt
employees whose wages and benefits are established by wage determinations or
[CBAs]."  AR 155−56 (RFP requirements); see also AR 1413 (TEC report) (restating
similar).  The Agency found that CMI failed to provide specifics regarding its approach;
instead, CMI made a summary statement in its proposal that it had experience with such
employees and a history of negotiating such agreements.  See AR 1437 (noting "[t]he
concern here is that, without a plan, the potential for mission failure resulting from strikes
and other labor actions could impact production on a national level").

CMI insists that it offered more than a bare assertion of its "strong history in
executing [CBAs]."  Pl.'s Mot. 17 (citing to AR 674 and 719, portions of CMI's technical
proposal).  It brought to bear its twelve years of experience working in union
environments and "its willingness, ability, and experience in negotiating and complying
with CBAs."  Pl.'s Mot. 17; cf. AR 674, 719 (TEC report) (asserting skills and
experience with labor issues as purportedly reflected in CMI's flexible "portrait"
contracts, knowledge of union operations such as dues and benefits, ability to maintain
good relations with union stakeholders and representatives, and history with a variety of
different CBAs).

D.     Technical Proposal – Evaluation of Factor One, Subfactor Four:  Relevant
       Corporate Experience

CMI contends that its Relevant Corporate Experience (Factor One, Subfactor
Four) was underrated as merely Acceptable in light of the Agency's finding that it had a
"'high level of confidence that [CMI could] rise to a high-level of performance,'" with no
cited weaknesses.  Pl.'s Mot. 17–18, 25 (quoting the Agency's technical report, AR
1437–38).

The RFP required each offeror to address its "relevant corporate experience as a
prime contractor (to include that of major subcontractors . . .)" across nine indices that
included the offeror's management "of multiple sites/locations[,] . . . of multi-functional
services[,] . . . of a [large] workforce[,] . . . of non-exempt employees covered by
[organized labor,] . . . of the types of tasks on the FOSS contract[,] . . . [and] of
significant workload volume with lulls and significant surge events."  AR 157-58.  The
offeror also was instructed to address its "customer service," as well as its ability to

10

"transition[] a workforce" and to "implement[] a training program" for a "workforce of [the] magnitude" contemplated in the FOSS solicitation.  Id.

The Agency found strength in: (i) CMI's prior contract, of a six year duration, that was "similar . . . in contract size and scope [and for which] related duties were successfully performed;" and (ii) "the CMI Team [who had] managed [another prior contract had remained] intact," which the Agency found "not only provides . . . assurance that management will be successful, but also speaks well of the relationship between the Team and its employer."  AR 1437–38; see also AR 1630 (past performance questionnaire) (USCIS contract administrator affirming he would award another contract to CMI based on its past successful performance).

"According to the ratings definitions and evaluation criteria (AR 1413–1415)," CMI argues, "'a high level of confidence' in a 'high level of performance' and no weaknesses [merits] either an Outstanding[] or at worst [a] Good[ ] rating."  Pl.'s Mot. 36 (quoting AR 1841, portions of the Competitive Range Determination).

The government charges that CMI improperly conflates the RFP requirements for Relevant Corporate Experience (Factor One, Subfactor Four) with Past Performance (Factor Three).  See Def.'s Reply Pl.'s Opp. (Def.'s Reply) 8, ECF No. 17.  The government asserts that the two inquiries are not synonymous.  Def.'s Reply 8; compare AR 157–58, 1413–14 (Relevant Corporate Experience requirements for the technical proposal) with AR 163–65, 1559–60 (Past Performance requirements for the business proposal).  Nonetheless, the government explains CMI was credited under both factors for its past experience.  CMI's past experience was the basis for a Strength under Relevant Corporate Experience and the basis for a Low Risk rating under Past Performance.  Def.'s Reply 9.  The government asserts, however, that CMI's past experience on the prior contract was not, in and of itself, sufficient to warrant a Good or Outstanding rating for Relevant Corporate Experience.  Def.'s Reply 8.  The FOSS contract is a different type of contract than the ones CMI previously performed because "FOSS is a hybrid Firm Fixed Price and Time and Materials contract [that] does not include the additional performance incentives that RSS did, [but does] include[] deductions for failing to meet [AQLs]."  Def.'s Reply 3 (citing AR 10, 26, 556).  As a result, "the FOSS contract [allegedly] has cost constraints, financial disincentives, and performance risks different than the prior RSS contract."  Def.'s Reply 3–4.  Thus, the government contends, not only is CMI's past performance ostensibly a limited indicator of its future performance for the TEC evaluators but, for the BEC evaluators, concern emerged that CMI might lack sufficient financial resources to support its performance during the first few months of the FOSS contract.  See Def.'s Reply 8–9, 13–15.

The government observes that although many of CMI's prior contract personnel were still employed (i.e., the President/Chief Executive Officer, Chief Operating Officer, Security Officer, Human Resources Director, Benefits Administrator, Management Analyst, and Billing Payroll Manager), the two "[k]ey [p]ersonnel" were new additions

(i.e., the Program Management and Deputy Program Manager).  Def.'s Mot. 12 (citing, e.g., AR 716).  The government maintains that the Agency acted within its discretion when it gave CMI an Acceptable rating rather than a Good or an Outstanding rating.  See Def.'s Mot. 34-35; Def.'s Reply 8-9.

      E.      Business Proposal – Evaluation of Factor Two, Subfactor Two:
                Participation in Mentor-Protégé Program

     CMI complains that the Agency erred by assigning it a negative Marginal rating for its Small Business Subcontracting, Mentor-Protégé Program (Factor Two, Subfactor Two).  Pl.'s Mot. 36–39; see also AR 1526–28 (Agency's assessment).

     The RFP preparation instructions required that "[i]f the offeror participates . . . in the DHS Mentor-Protégé program [as is encouraged but not required], the proposal shall include [from] the Office of Small and Disadvantaged Business Utilization (OSDBU) [a] signed letter of Mentor-Protégé Program approval and the actual agreement between the Mentor and Protégé describing the relationship and areas of assistance."  AR 161; see AR 156.  In addition, the solicitation required that "[i]f the offeror does not participate in the DHS Mentor-Protégé Program, the offeror shall [so] certify."  AR 161 (emphasis omitted).

     CMI's proposal included neither the approval letter nor a certification of non-participation, although it did include a copy of a Mentor-Protégé Agreement.  AR 1526–28.  Ten days after the proposal due date, CMI supplemented its proposal with an approval letter.  AR 1526; see also AR 1405–06 (cover email and approval letter).  The CO rated CMI as Marginal based on its late submission of the approval letter, which was needed to show official approval of its Mentor-Protégé Agreement.  AR 1528.  The government maintains that the rating the Agency assigned was "strictly in accordance with ratings in the Source Selection Plan" and was appropriate due to CMI's failure to comply with solicitation requirements.  Def.'s Mot. 36.

     CMI contends that these purported failures did not justify an adverse rating because (i) USCIS had actual knowledge, or should have known based on information "close at hand," that CMI was approved for the program; (ii) CMI included the signed Mentor-Protégé Agreement, albeit without the approval letter; (iii) the Agreement described at length, and in a meaningful way, how the Mentor would use a Protégé, and vice versa, to achieve program goals; (iv) the approval letter was delayed due to factors beyond CMI's control but within the control of the DHS; and (v) the absence of the approval letter was explained in another letter from DHS, which CMI included in its proposal.  Pl.'s Mot. 18–20, 36–37.

     Nonetheless, even if the absence of the letter could not be forgiven, CMI avers that the absolute lowest rating it should have received was a Neutral rating.  Pl.' Mot. 38.  The RFP did not require, but "encouraged," participation in the program.  AR 156.  CMI

argues that the Agency acted unreasonably by penalizing CMI with a negative Marginal rating, whereas offerors who did not participate in the program were assigned a Neutral rating. Pl.'s Mot. 19, 37-38. CMI contends that the proper rating to be assigned was either Acceptable, or one of the positive ratings (Good or Outstanding). Pl.'s Mot. 38.

III.    Applicable Legal Standards

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract." 28 U.S.C. § 1491(b)(1).

The court reviews an agency's procurement decision to determine whether the decision is supported by the administrative record. See RCFC 52.1. The Administrative Procedure Act (APA) standard of review applies to the court's examination of an agency's decision, meaning that it will set aside a decision by the agency only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012). The court will sustain an agency decision that has a rational basis. See Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir. 2013).

The court will set aside an agency's decision as arbitrary and capricious if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

"A bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The first step is to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law. Id. The second step is to determine whether the agency's action in error was prejudicial. Id. The Appeals Court has directed that prejudice in a pre-award bid protest context means that that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

The disappointed party has "a 'heavy burden' of showing that the award decision 'had no rational basis.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)). Contracting officials have wide discretion in their role in the procurement process. Id. at 1332. To surpass the threshold of arbitrary and capricious, an agency's decision need only have been "the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n.8 (2002) (quoting Baltimore Gas

& Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003).  Moreover, contracting officials have particularly "broad discretion in determining [the] competitive range."  Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d 970, 973 (Fed. Cir. 1993).

The Federal Acquisition Regulations describe when a CO may limit the number of proposals in the competitive range.  See FAR § 15.306(c)(2).  "[T]he [CO] may limit the number of proposals . . . to the greatest number that will permit an efficient competition among the most highly rated proposals" if "the solicitation notifies offerors that the competitive range can be limited for purposes of efficiency," and the CO determines "that the number of most highly rated proposals that might otherwise be included in the competitive range exceeds the number at which an efficient competition can be conducted."  Id.

IV.    Discussion

CMI's challenge to the Agency's evaluation of its proposal focuses primarily on its rating under the most important subfactor, Subfactor One (Operational Approach) under the most important factor, Factor One (Management Capability).  CMI also questions the Agency's ratings of Subfactors Three (Management Approach) and Four (Relevant Corporate Experience) under Factor One, and Subfactor Two (Participation in DHS Mentor-Protégé Program) under Factor Two (Small Business Subcontracting). Defendant introduces a discussion of Subfactor Two (Staffing), under Factor One, to defend the Agency's decision.

Before turning to address the parties' arguments and make findings, the court first considers CMI's complaint that had it been given an opportunity to clarify each issue described as a weakness, the Agency would have awarded it higher ratings.  See, e.g., Pl.'s Mot. 5–6.  The Source Selection Plan set forth the requirement that plaintiff's initial proposal contain the offeror's best terms.  AR 573.  The Agency had no duty to conduct discussions or attempt to clarify ambiguities in the proposals of offerors not in the competitive range.  AR 573; see also FAR § 15.306.  The duty fell upon CMI to adequately describe its proposal for the contract in its paper submissions.  See Westech Int'l, Inc. v. United States, 79 Fed. Cl. 272, 296 (2007) ("Undoubtedly, an offeror carries the burden of presenting 'an adequately written proposal . . . .'") (quoting United Entm't & Assocs. v. United States, 70 Fed. Cl. 1, 26 (2006)).  The Agency's refusal to seek clarifications from CMI was not in error.

A.    The Agency's Evaluation of CMI's Technical Proposal as Acceptable for Factor One, Management Capability, Was Rational

The two contractors included in the competitive range were rated higher than CMI under Factor One, Management Capability, the most important evaluative factor; they were rated respectively Outstanding (USIS) and Good (FCi).  AR 567, 1439, 1476.  CMI

was rated Acceptable based on its ratings of Acceptable for Subfactors One, Two, and Four, and its rating of Good for Subfactor Three. AR 1428. In contrast, FCi was rated Good overall based on its received ratings of Good for all four subfactors. AR 1439. And USIS received a rating of Outstanding for Factor One based on its received ratings of Outstanding for three of the four subfactors including Subfactor One. AR 1476.

> 1.     The Agency's Evaluation of CMI's Technical Proposal as Acceptable for Subfactor One, Operational Approach, Under Factor One, Was Rational

The Operational Approach Subfactor was the most important subfactor in the Agency's evaluation of the proposals. AR 567 ("Each proposal shall be evaluated against the evaluation factors . . . in descending order of importance . . . . The Subfactors are [also] listed in descending order of importance."). CMI was rated Acceptable for Subfactor One based on the Agency's description of two strengths and two weaknesses. AR 1429–30. The two offerors that were included in the competitive range were rated higher. FCi's rating of Good for Subfactor One was based on the Agency's identification of three strengths and no weaknesses. AR 1439–41. The Agency awarded USIS a rating of Outstanding for Subfactor One based on its finding of four strengths and no weaknesses. AR 1477–78.

To satisfy the requirements of Subfactor One, the Agency expected offerors to describe their proposed management of daily operations:

> The offeror's proposal will be evaluated to the extent to which the proposed solution addresses and demonstrates . . . [t]he concept of operations; methods the offeror proposes to maintain daily operations at the FOSS sites and in accordance with prescribed procedures according to required timetables; why [the] proposed operational approach is workable and realistic; and [an] understanding of the variations in operations at the various sites.

AR 567.

CMI asserts that its Acceptable rating would have been Good or even Outstanding but for the Agency's erroneous assignment of weaknesses for this subfactor. Pl.'s Mot. 16. The Agency assessed CMI's proposal with the following strengths and weaknesses:

STRENGTHS:

1.    The Offeror's approach to retention and training will complement its operational approach by ensuring staff are available and ready with the appropriate skillsets to perform daily operations within required timelines (pages 7, 27-38, 32-33). Introduction of the RMT training

program shows commitment to workforce development and career development/retention which benefits USCIS by increasing employee skill proficiency/readiness and reducing costs associated with frequent employee turn-over impacting daily operations. Likewise, the Offeror's emphasis on cross-training will ensure a workable and realistic approach to handling workload balances.

2. The use of the EPTS would serve to benefit USCIS by tracking employee workloads, performance, and productivity levels (page 11). The system's features provide immediate identification of operational variations, give insight into production bottlenecks, allow for easier reconciliation of invoices, and capture average times typically taken to complete tasks. It appears that this system will serve as a useful tool to analyze an approach towards USCIS' goal of changing future contract types to incorporate additional fixed pricing initiatives. Providing the GPM and HQ COR real-time access to this system will allow timely production and cost analysis that can lead to better and more expedient recognition of best practices or earlier mitigation of identified risks.

WEAKNESS[ES]:

1. As described, the Offeror was the service provider of note on the RSS contract for 6 years and is currently a subcontractor on the NBC [National Benefits Center] contract performing at AQL of 98% for the last 3 years (page 3). However, it does not appear that the Offeror has a firm grasp on changes that have occurred since its previous history on the former FOSS (RSS) USCIS contract. This is evidenced in this proposal by the Offeror's use of outdated labor category terms (e.g., RMT), and recommendations to improve existing processes. As examples:

   a. The Offeror suggests (page 13) use of color-coded bins, but does not provide evidence of how quality will be improved to meet the customer's need by using this method. Analysis of how the initial cost of purchasing color-coded bins and pouches resulting in a reduced processing time should have been provided so that the government could determine if a benefit exists. For example, was processing time reduced by 1 FTE as a result of using the bins? Without the analysis provided by the Offeror it cannot be determined if this is a recommendation that would be accepted by the government or if efficiencies result from the implementation.

16

    b.  With regards to inserting the N445s [Notices of Naturalization] (page 22) when the certificate is removed, according to the Offeror this process was implemented when the previous contract was in place.  If the government implemented it at that time as an efficient and cost effective process the recommendation to use it is not a new and innovative submission.  The Offeror did not provide verification or analysis of how the process expedites the close out procedures.

    c.  Page 16 refers to coordinated audit activities; however, that coordination already exists so there is no additional benefit to the government.

    d.  Requests for RAP sheets (page 21) are already mandatory.

2.  Offerors were asked to describe methods used to maintain daily operations for the FOSS sites and in accordance with prescribed procedures within required timetables.  In response to this, the Offeror repeated the Performance Work Statement requirement paragraphs, stating that these tasks would be performed (pages 12-26).  Little to no detail or methodology was described for how those daily operations would be maintained or managed according to timelines.  It appears the RFP paragraphs were cut and pasted into the proposal to address maintenance of daily operations.  However, listing and/or repeating the contract requirements from the RFP does not provide the methodology for how those daily operations will be maintained, i.e., priorities set, reassignment of personnel.  Although use of the EPTS tool is proposed for documenting task status (and viewed as a strength), the EPTS cannot capture the methodology the Site Managers will use to oversee day-to-day operations or to integrate goals with day-to-day operations while being flexible enough to allow for sudden shifts in workload.  A lack of day-to-day operational methodology associated with the government's timetables could result in failure to assign priority work in a timely manner; inappropriate use of personnel or reassignment of personnel; and failure to oversee staff by appropriate personnel.  In the case of the San Bruno Project, for example, the Offeror did not adequately address an approach to perform the San Bruno Records Center file retirement task (page 26).  No plan was outlined on how to execute associated tasks or mitigate risks regarding file processing.  The Offeror states it has a wealth of knowledge and experience to ensure proficient operations, but didn't provide or articulate a plan (only proposed what was provided in the RFP).  A potential failure of insufficient planning

could result in not having appropriate staffing levels or [a] systematic approach; thus having a potential to create backlog issues.

AR 1429–31.

a.  Subfactor One's Adjectival Rating Was Consistent With the RFP's Adjectival Definitions

CMI argues that, in violation of the RFP criteria, the rating the Agency assigned to it did not correspond to the number of its noted strengths and weaknesses.  Pl.'s Mot. 29; see AR 574 (adjectival ratings defined).  CMI was rated Acceptable for this subfactor.  An adjectival rating of Acceptable is appropriate where: "The proposal demonstrates an acceptable understanding of the requirements.  The proposal contains only minor or no strengths.  Any weaknesses are not significant weaknesses."  AR 574.

CMI asserts that it should have received, at least, a rating of Good instead of an Acceptable rating.  Pl.'s Mot. 29–30.  A Good rating applies when: "The proposal clearly demonstrates a good understanding of all aspects of the requirement so that performance is expected to be of high quality.  The proposal has some strengths that will significantly benefit the Government.  Any weaknesses are not significant weaknesses."  AR 574.

CMI complains that a rating of Acceptable was inappropriate when the evaluators assigned it two strengths in this category.  Pl.'s Mot. 29–30.  As defined, an Acceptable rating can apply to proposals that are awarded "minor or no strengths."  The court does not find in the record how a "minor strength" is distinguished from a "strength."  But it appears that the evaluators viewed CMI's strengths as minor and, accordingly, designated its proposal under this subfactor as Acceptable.  Because there is nothing in the record that counsels otherwise, the court cannot find that CMI's Acceptable designation was irrational.

CMI complains that the weaknesses described in the Agency's evaluation were based on factual errors and inconsistences.  Pl.'s Mot. 30.  But even if no weaknesses had been assigned to CMI under Subfactor One, its proposal still fell within the defined parameters of an Acceptable rating, which allowed, "[a]ny weaknesses [that] are not significant weaknesses."  AR 574.  Thus even a proposal with no weaknesses assigned could rationally fall within the definition.  The definition refers to any weaknesses; it does not state that weaknesses must be found for an assignment of Acceptable to apply.

Nevertheless, for the sake of completeness, the court examines the Agency's assignment of strengths and weaknesses, under the critical Subfactor One, to CMI's technical proposal for error.

b.    The Agency's Assignment of Weakness One to CMI For
Failing to Show it Had a Firm Grasp on Changes That Had
Occurred Since Its Work on the Former Contract Was
Rational

The Agency found that CMI did not have an understanding of changes that had occurred at USCIS since CMI's work on the prior RSS contract. AR 1834. While the Agency's articulation of this weakness and its supporting examples are not a model of clarity, the court finds that the Agency's assignment of a weakness to CMI for its failure to show it had a firm grasp on changes is supported by the record on the whole. See BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677, 684 (2012) ("The court will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974))).

The Agency described its identification of Weakness One by stating, "[a]s described, the Offeror was the service provider of note on the RSS contract for [six] years and is currently a subcontractor on the NBC contract performing at AQL of 98% for the last [three] years . . . ." AR 1429. Noting the emphasis and reliance CMI placed in its proposal on its work on the prior contract, the Agency observed that, "it does not appear that the Offeror has a firm grasp on changes that have occurred . . . ." Id. The issue of CMI's overreliance on its past performance, at the expense of demonstrating present-day readiness to perform, was a repeated observation throughout the TEC evaluation. See, e.g., AR 1429, 1431–32, 1437. The court perceives the Agency's discussion of Weakness One to embody its view that CMI did not do enough to explain its current capacity to conduct operations. Although several of the examples provided by the Agency to support its finding of Weakness One are either less than clear or reflect errors, the court finds that the record contains support for the Agency's assignment of this weakness. The court addresses the examples in turn.

One example the Agency provided to support Weakness One is CMI's use in its proposal of outdated labor category terms such as RMT. AR 1834. CMI avers that its use of the acronym RMT was intended to refer solely to its Records Management Technician training program, a cross-training and employee retention program that was identified as a strength in the Agency's evaluation of Subfactor One. Pl.'s Mot. 27; see AR 1834. CMI explains that it never intended to use the acronym to refer to a labor category and charges that the evaluators unreasonably misinterpreted its use in the proposal. Pl.'s Mot. 27.

An examination of CMI's technical proposal reveals that CMI often made reference to its training program without using the acronym RMT as a qualifier. In spite of CMI's insistence that it "repeatedly state[d] that RMT is a training and promotional program," Pl.'s Mot. 27, the record clearly demonstrates otherwise. In its "Glossary of Terms," CMI defined RMT as "Records Management Technician" without any reference

19

to a training program. AR 601. This definition provided by CMI in its proposal describes a job title, not a cross-training program as CMI now asserts.

In numerous instances, CMI used the term RMT in its technical proposal to refer specifically to an employee's title rather than to a training program. See AR 624, 627, 629–31, 635–36, 638. For example, when describing its "Concept of Operations," CMI mentioned its "aggressive training program," but did not add the RMT modifier that it used to describe step increases for its employees. AR 620 (stating that employees will have to demonstrate particular knowledge to be certified for a step increase "for example, from a Records Management Technician I to II (RMT I to II)"). Moreover, when it described its "Program Management Approach," CMI stated in its proposal that its RMTs "will be tremendous repositories of program knowledge." AR 622.

CMI did describe its RMT training program in its discussion under Staffing Subfactor Two, AR 642–43, but even there, CMI failed to explain why it also used the acronym RMT to describe its employees in other areas of its proposal.

The confusion created for the TEC evaluators might have been eliminated if CMI's technical proposal had contained the Labor Categories Crosswalk table that appeared in CMI's business proposal. See AR 787 (Labor Categories Crosswalk).[5] This chart lists as CMI's job title and code, Records Management Tech and RMT, as well as the DHS and DOL equivalents, respectively File Clerk and General Clerk, for example. Id. This chart might have addressed the TEC evaluators' concerns about CMI's use of outdated labor categories. But because it was located in the offeror's business proposal, it was considered by a separate team of evaluators. See AR 561.

CMI's use of the RMT acronym understandably caused confusion among the evaluators. That confusion resulted in assigned credit for CMI's RMT training program, but assigned fault for CMI's use of RMT as an outdated labor category. Conceivably, the CO or the Source Selection Advisory Council[6] could have addressed this point of confusion with the evaluators to determine that CMI had not, in fact, used the term RMT

---

[5]     While the inclusion of this chart in CMI's technical proposal might have served to explain its use of RMT to evaluators, the use of RMT as a labor category in the chart also serves to undercut CMI's claim that it never refers to RMT as a labor category in its proposal.

[6]     The Source Selection Advisory Council (SSAC) was composed of members different from the Technical Evaluation Committee (TEC) or Business Evaluation Committee (BEC). Compare AR 558, with AR 561. This council was responsible for reviewing the work of the TEC and the BEC and providing advice to the Source Selection Authority, charged with selecting the proposal that represents the best value to the government. AR 557–58.

to describe a labor category.  But no such clarification occurred, and the unresolved confusion led to an internal conflict in the evaluators' assignment of strengths and weaknesses to CMI's proposal for this critical subfactor.

The internal inconsistency in the Agency's evaluation notwithstanding, it was CMI's responsibility to present an adequate proposal.  See Westech Int'l, Inc., 79 Fed. Cl. at 296.  The RMT confusion was caused by CMI's own failure to explain adequately its use of the RMT acronym.  CMI cannot now complain of an unfairly assigned weakness when the source of the confusion was CMI.

Further, the court is not persuaded that an earlier clarification of the RMT issue would have changed the TEC evaluators' overall assignment of weaknesses to CMI, its rating under Subfactor One, and its ultimate exclusion from the competitive range. CMI's use of "an outdated labor category" was only one of the examples the Agency provided in support of its overall conclusion that CMI did not have a grasp on changes that had occurred. [7]

Another example cited by the Agency that the court finds to lend clearer support to the Agency's assessment of Weakness One is CMI's proposal to coordinate audit activities, a process that already exists.  AR 1429.  Although CMI insists that it was aware that such coordination was not a new practice, Pl.'s Mot. 13, a review of CMI's proposal is more supportive of the different understanding reached by the Agency from CMI's representation that:  "Team CMI will propose coordinated audit activities across the nation by program or standardized RPC sections."  AR 626.  This representation reinforced the Agency's view that CMI did not have a grasp of the attendant contract changes from the solicitation.

Among the other examples cited by the evaluators was CMI's suggested use of color-coded bins without an explanation of how such bins would serve as an improvement.  AR 1430.  Although potentially a legitimate criticism of CMI's proposal, the Agency's logic for citing this suggestion as an example of CMI's questionable understanding of the changes in the solicited contract is unclear.  See id.

---

[7]      CMI also argues that if there were changes of which it should have been aware, the RFP should have revealed them, and that if the RFP did not do so, the Agency's assignment of a weakness on this ground was in error as it was based on "unstated evaluation criteria."  Pl.'s Opp. 7–8.  This argument mischaracterizes the Agency's evaluation of CMI.  CMI had the same opportunities as the other offerors to understand the requirements of the solicitation, and to participate in the same pre-solicitation process of providing input to the contracting officials.  See Def.'s Reply 5.  Any unstated evaluation criteria would have been unstated for all offerors.  CMI appears to have chosen to rely heavily on its experience on the prior contract, and the evaluators rationally concluded that it did not demonstrate an adequate understanding of the changes that had occurred since CMI's work on the prior contract.

The Agency also faulted CMI for billing as new its plans to insert Notices of Naturalization into the files when certificates were removed, see id., and to include FBI RAP sheets in the files.  But, CMI clearly acknowledged in its proposal an awareness that those practices had been implemented previously.  AR 631–32.  Review of the record indicates that the evaluators' characterization of those suggestions in CMI's proposal wrongly implied that CMI presented the processes as innovative suggestions.  AR 1430.

The court is of the view that the aforementioned examples—pertaining to color bins and filing protocols and cited by the Agency to support its finding of Weakness One, under Subfactor One—lack support in the record and do not constitute evidence of the weakness described.  Nonetheless, the court cannot find error in the Agency's overall conclusion in Weakness One that CMI did not seem to have a satisfactory understanding of changes that had occurred in the three years since it completed its work on the former contract.  CMI's heavy reliance on its past experience failed to persuade the Agency of CMI's present-day readiness to perform the contract.  After careful review of the record, the court cannot find that the Agency's assignment of Weakness One under the critical Subfactor One was arbitrary or irrational.

> c.  The Agency's Assignment of Weakness Two to CMI for Repeating the RFP Requirements and for Insufficiently Detailing How Daily Operations Would Be Maintained Was Rational

The TEC evaluators found that CMI "cut and pasted" the RFP requirements into its proposal for some sections of the Operational Approach Subfactor.  AR 1430.  CMI provided "[l]ittle to no detail or methodology . . . for how those daily operations would be maintained or managed according to timelines."  Id.

CMI claims that its proposal referenced excerpts of the Performance Work Statement that were necessary to link its proposal to the requirements.  Pl.'s Mot. 14–15.  CMI points to its description of the EPTS program, which the evaluators designated as a strength, as one example of its articulation of a plan.  Pl.'s Mot. 33.  CMI adds that it addressed its past performances only when directly relevant and it provided detailed explanations regarding how it would conduct daily operations.  Pl.'s Mot. 34.

The court has reviewed the relevant section of the Performance Work Statement and CMI's proposal and concludes that the TEC report did not characterize CMI's proposal irrationally.  Compare AR 80–125 (Performance Work Statement), with AR 617–639 (CMI's technical proposal).

As an example, the court quotes from the Performance Work Statement in the RFP the enumerated requirements for 4.4 Administrative Support:

- Provide traffic flow services which can include directing an applicant to a specific counter, line, or room number.
- Provide an applicant with a request form.
- Answer phones, only to the extent of transferring the call to the appropriate person or operating unit.
- Escort individuals to and from specific locations within the building (e.g., escort an individual to an Immigration Service Officer for scheduled interview.)

Note: The contractor is not authorized to serve, or represent themselves, as an official USCIS representative.

AR 91.  In CMI's introduction to its "Administrative Support" section, it provides, in part:

> CMI will provide triage services for USCIS such as directing applicants to room, counter, or line, or supplying applicant with appropriate forms. Team CMI will answer phones with the intent of transferring calls to the appropriate person or operation unit, and will escort individuals to and from specific locations within the building, such as an AO office, for a scheduled interview.  Team CMI understands that we are not Government employees and in no way represent ourselves as Government [e]mployees.

AR 630.

The language in CMI's proposal mirrors that of the RFP, supporting the evaluators' charge that CMI put forward in its proposal a cut and paste from the RFP. CMI's claim that the mere incorporation of language from the RFP to tie its proposal to the work requirements was not unreasonable, and it did provide a further description of its proposal for Administrative Support after an introductory paragraph that closely tracked the language of the RFP.  See AR 630.  The Agency, however, expected detail and descriptions of methodology beyond what CMI provided, and in the absence of that, the Agency assigned a weakness to CMI.  Showing that the Agency acted irrationally is a heavy burden for plaintiff, see Impresa, 238 F.3d at 1333, and on this record, the court does not find that the evaluators' decision was arbitrary with respect to this identified weakness.  The court is persuaded that the Agency's designation of CMI's proposal as Acceptable for Subfactor One, based on the two strengths and two weaknesses described, was rational.

    2.    The Agency's Evaluation of CMI's Technical Proposal as Acceptable for Subfactor Two, Staffing, Under Factor One, Was Rational

CMI's Acceptable rating for Staffing (Factor One, Subfactor Two) is supported fully by the record, which demonstrates that CMI was properly assessed two strengths

and two weaknesses.  See AR 1431.  For this subfactor, the RFP instructions directed offerors to "address and describe" Staffing on three fronts:  (i) key personnel; (ii) recruitment and retention for offices of various sizes; and (iii) contractor organization.  AR 155.  The Agency praised CMI on the first two of the three staffing considerations in its proposal and awarded CMI two strengths.  AR 1432.

The Agency found CMI's two "key personnel" to be "well-qualified and [to] have specific, proven, history/experience with USCIS that [would] allow an immediate and smooth transition period" and thereby inspire government "confidence."  AR 1432.  This finding is amply supported by the pages of detailed discussion in CMI's technical proposal of the two key personnel and their education, training, and relevant experience for the FOSS contract.  See AR 640–42 (discussing key personnel).

The Agency also found that CMI's "holistic approach to recruitment" was likely to "minimize hire-lag time" and its "cross-training and career development plans" were also likely to "assist in [the] retention of well-skilled staff."  AR 1432.  In its technical proposal, CMI addressed in a substantive discussion its "partnership approach" to recruitment; its methods for filling vacancies while ensuring work continuity; and a myriad of flexible training and continuing education programs it had developed to promote employee success, advancement, and retention.  AR 640-48.

Also consistent with the solicitation requirements, see AR 155, CMI's proposal addressed its anticipated organizational structure by setting forth in various tables and flow-charts its projected staffing levels by, inter alia, location and labor category.  See AR 649-655.  The included tables and flow charts also showed the number of employees serving in either a full-time, part-time, or on-call capacity.  Id.  Contrary to the solicitation requirements, CMI devoted only a paragraph or two of narrative, see AR 648, 656, to "discuss[ing] and justify[ing] [the] levels of staffing and skill mix" that were set forth in its tables and flow-charts.  See AR 155 (RFP requirements).  CMI summarily addressed its past success in staffing prior contracts:  "Our experience on previous staffing endeavors for the USCIS informs [the] calibration between human resources and task requirements.  Team CMI is confident in our calculations of the staffing/skill mix . . . ."  AR 656.  Although CMI's past success may have been relevant and informative, the Agency appropriately faulted CMI for "not provid[ing] the required justification for [anticipated] staffing levels, skills mix, or labor categories."  AR 1432 (Weakness One).  The Agency's determination that CMI's reference to its past success was neither a sufficient explanation nor justification for the proposed staffing levels, particularly in the absence of any discussion regarding similarities between the prior and current contracts, fell squarely within the realm of its discretion.  See AR 1432.

The Agency also properly exercised its discretion when it assigned a second weakness to CMI for "develop[ing] a staffing plan based on its experience and history with the former [RSS] contract instead of using the workload presented in the RFP."  AR 1432 (previewing Weakness Two discussed at AR 1432-33).  CMI stated in its proposal

that it "developed [its] staffing estimates using its past performance on the USCIS RSS contract as well as on [contracts of other] similar scope and size tasks and factual data." AR 648.  At no time did CMI describe the similarities between its prior contract and the FOSS contract at hand.  Thus, the Agency properly concluded that CMI's use of "other than the provided workload could result in inappropriate staffing levels and, thereby, provide the government with overstaffing or understaffing."  AR 1433 (Weakness Two).

CMI contends that "[c]ontrary to the Agency's statements, [it] did base its staffing levels on current workloads provided in the RFP."  Pl.'s Opp. 8.  As support for its claim, CMI points to a page of its technical proposal to show that it relied on the RFP's anticipated workloads.  See AR 647.  The cited record page states that CMI "based [the] staffing levels [in its proposal] on historic average workloads and [its] experience in establishing the level of effort required to ensure Performance Requirements are at par meeting or exceeding AQLs."  AR 647 (emphasis added).  The court cannot discern how this page of CMI's proposal demonstrates reliance on the RFP's anticipated workloads.[8]

CMI does state elsewhere in its proposal (not in its technical proposal, but in its business proposal) that it "compared production levels" of its prior contract to "production volumes" set out in the RFP.  AR 788.  The TEC, however, did not have access to information contained in CMI's business proposal when it reviewed CMI's technical submission.  See Def.'s Reply 10 (explaining that the TEC only had access to the information in an offeror's technical proposal).  Thus, the Agency did not act irrationally when it assigned the two weaknesses discussed to CMI for the staffing subfactor.

The Agency also acted rationally and consistent with its discretionary judgment when it determined that CMI's two strengths and two weaknesses under this Staffing Subfactor merited a rating of Acceptable rather than Good.[9]  As gleaned from the record, the difference between the two ratings is a matter of degree; an Acceptable rating contemplates "only minor or no strengths" and "no[] significant weaknesses," whereas a Good rating contemplates "some strengths" and "no[] significant weaknesses."  AR 1415.  As informed by the rating definitions, the Agency found, by implication, that CMI's strengths were "minor" rather than "significant."  The court defers to the Agency on the quality of CMI's strengths because there is not countervailing evidence before the court that warrants disturbing the Agency's assessment in this area.

---

[8]     Even if this statement were understood to support CMI's contention that it did rely on the RFP's anticipated workloads, the mere assertion of such reliance by an offeror, with no further explanation or attendant showing, does not satisfy the requirements of the RFP.

[9]     CMI did not qualify for an Outstanding rating because of its two weaknesses.  Cf. AR 1414 (defining Outstanding as requiring "several strengths" and "no weaknesses").

The Agency's evaluations of CMI's proposal under Subfactors One and Two, the most important subfactors, were rational. Because CMI received an Acceptable rating for the most important subfactors, a positive adjustment in the ratings of the less important subfactors would not have raised CMI's overall score for Factor One. Nevertheless, the court addresses CMI's arguments regarding the Agency's evaluations of the less important Subfactors Three and Four under the Management Capability Factor (Factor One).

3.      The Agency's Evaluation of CMI's Technical Proposal as Good for Subfactor Three, Management Approach, Under Factor One, Was Rational

CMI was rated Good for Subfactor Three, Management Approach, based on the Agency's assignment of five strengths and one weakness. AR 1431-37. CMI argues that it should have been rated Outstanding. Pl. Mot. 17. The two offerors included in the competitive range were also rated Good for Subfactor Three. AR 1443, 1476. FCi was awarded three strengths and no weaknesses. AR 1448–49. USIS was given four strengths and one weakness. AR 1480–86.

The Agency required offerors to describe their approach in the following categories: interfacing with USCIS, subcontracting arrangements, approach to managing workload, wage determination and collective bargaining agreements, quality control, customer satisfaction, innovation, training, and initial transition. AR 568–69. The offerors' proposals were evaluated accordingly.

Consistent with the RFP instructions, a Good rating applies when: "The proposal clearly demonstrates a good understanding of all aspects of the requirement so that performance is expected to be of high quality. The proposal has some strengths that will significantly benefit the Government. Any weaknesses are not significant weaknesses." AR 574. In contrast, an Outstanding rating is appropriate where: "The proposal clearly demonstrates an outstanding understanding of all aspects of the requirement so that performance is expected to be of the highest quality. The proposal has several strengths that will very significantly benefit the Government. There are no weaknesses identified." Id. Because the Agency found one weakness in CMI's proposal, an Outstanding rating would not have been appropriate. The court turns next to evaluate whether the one weakness the Agency identified was supported by the record.

The Agency assigned a weakness to CMI under this subfactor (Management Approach) based on the Agency's determination that CMI "did not adequately reveal [its] approach to managing non-exempt employees where wages and benefits are established by [organized labor laws]." AR 1437. This weakness was supported by the record. Here, once again, the Agency noted that CMI relied too heavily on its past experience. Id. CMI described its past experience in executing collective bargaining agreements in a summary fashion, rather than providing the necessary explanation of how it achieved

such success.  See AR 674 (CMI's proposal).  As the Agency correctly pointed out, CMI "didn't provide specifics about [its] management approach or mention what negotiating strategies [it] employed that led to [its] success." AR 1437.  Instead, it provided only a brief narrative that was summary in nature.  See AR 647.  The Agency rationally concluded that "[t]he concern here is that, without a plan, the potential for mission failure resulting from strikes and other labor actions could impact production on a national level." Id.

The court cannot find that the Agency acted arbitrarily in finding a weakness in CMI's proposal or for awarding CMI a Good rating for the Management Approach subfactor, rather than Outstanding.  The Agency's evaluation was rational.

4.   The Agency's Evaluation of CMI's Technical Proposal as Acceptable for Subfactor Four, Relevant Corporate Experience, Under Factor One, Was Rational

CMI received a rating of Acceptable for Subfactor Four, Relevant Corporate Experience, based on the Agency's identification of one strength and no weaknesses.  AR 1437-38.  CMI complains that it should have received a rating of at least Good for this subfactor.  Pl.'s Mot. 17-18.

CMI's competitor, FCi, was rated Good for this subfactor based on the Agency's finding of three strengths and no weaknesses, AR 1449-50, and its other competitor, USIS, was given a rating of Outstanding with one strength and no weaknesses described, AR 1486-88.

Offerors were required to explain their relevant corporate experience "as a prime contractor (to include that of major subcontractors or teaming partners)" in management of multiple sites, multi-functional services, workforce, non-exempt employees covered by organized labor laws, and workload volume with lulls and surges.  AR 569.  Offerors were also required to explain their relevant experience with customer service, transitioning a workforce, and implementing a training program.  Id.

The Agency's evaluation of CMI described "a high level of confidence that the Offeror [could] rise to a high-level of performance on the FOSS contract, especially when considering that the 'Team' that managed the RSS [contract] . . . still [would be] 'on-board.'" AR 1437.  Accordingly, CMI was awarded strength.  AR 1437-38.  CMI argues that such high praise deserved a better rating than simply Acceptable.  Pl.'s Mot. 18.

The court's review indicates that the government's defense of the rating it gave plaintiff on this subfactor does not obtain support from the record.  Among the government's offered arguments is the claim that CMI conflated the requirements for Relevant Corporate Experience in the technical proposal with those for Past Performance in its business proposal.  Def.'s Reply 8.  A comparison of the two requirements,

however, shows an overlap that explains why CMI's discussion of the two subfactors would be similar.  Compare AR 157–58, with AR 163–65.

The government also faults plaintiff for no continuity among its "key personnel." Def.'s Mot. 12 (citing AR 716).  Yet, CMI received praise for its intact management team, and the Agency evaluators expressed no concern about the turnover of two employees that the government references in its briefing.  See AR 1437–38.  The record does not show the lack of continuity that the government now describes.

Although the Agency's scant explanation of its rating on this subfactor in its evaluation (and the government's equally lackluster defenses in its briefing) provides only a bare justification for its assignment to CMI of an Acceptable rating, the assessed rating for the number of strengths (one) and weaknesses (zero) identified in CMI's proposal is not inconsistent with the RFP's parameters for an Acceptable rating.  See AR 574 (defining an Acceptable proposal as "demonstrat[ing] an acceptable understanding of the requirements . . . [and] contain[ing] only minor or no strengths").  By comparison, a higher Good rating would have required the Agency to have concluded CMI's one strength was likely to "significantly benefit the [g]overnment."  See AR 574.  Although the record does not contain this finding, there are facts in the record from which the court could infer a basis for the finding.  Nonetheless, the Agency's determination in this area, albeit not well documented, was not irrational.

But, even if the court were to find that CMI's rating for Subfactor Four as Acceptable rather than Good was ill-founded, the court could not find that the rating prejudicially harmed CMI.  A better rating for CMI on this subfactor would have no material bearing on CMI's overall rating of Acceptable for Factor One because the subfactors are listed in descending order of importance, and the Agency's evaluation of the three more important subfactors was rational.

B.      The Agency's Evaluation of CMI's Business Proposal as Acceptable for Factor Two, Small Business Subcontracting, Was Rational

The two contractors included in the competitive range were rated Marginal (USIS) and Outstanding (FCi) under Factor Two, Small Business Contracting.  AR 1516.  CMI was rated Marginal based on its ratings of Marginal for Subfactors One and Two, and its rating of Acceptable for Subfactor Three.  AR 1525, 1528–29.  FCi received a rating of Outstanding based on ratings of Outstanding for Subfactors One and Two and its rating of Acceptable for Subfactor Three.  AR 1531–33.  USIS was rated Marginal based on its rating of Marginal for Subfactor One, Outstanding for Subfactor Two, and Acceptable for Subfactor Three.  AR 1547–49.

The evaluation scheme for Factor Two differed slightly from the one used to evaluate Factor One.  Subfactor Two, under Factor Two, was rated using the adjectival ratings:  Outstanding, Good, Acceptable, Marginal, Unacceptable, and Neutral.  AR 178.

28

1.     The Agency's Evaluation of CMI's Business Proposal as Marginal for Subfactor Two, Participation in DHS Mentor-Protégé Program, Under Factor Two, Was Rational

a.     The Adjectival Rating Definitions For Subfactor Two

Unlike the standard adjectival ratings under Factor One, the definitions of the adjectives vary for each subfactor under Factor Two. The relevant definitions for Subfactor Two are as follows: A rating of "Marginal (but could be made acceptable)" is appropriate where "Offeror is participating in the Mentor-Protégé program; however the proposal does not include one or more of the following: OSDBU letter of acceptance, the agreement, or description of how the Protégé will be used in a meaningful way . . . ." AR 1514. In contrast, an Acceptable rating is appropriate where the "Offeror is participating in the Mentor-Protégé program. The proposal includes the OSDBU letter of acceptance, the agreement, and participation of the Protégé is meaningful and meets the developmental assistance goals of the Mentor-Protégé agreement." AR 1513.

b.     The Agency Assigned to CMI Significant Weaknesses and Awarded a Rating That Conformed With Its Evaluation Criteria

The Mentor-Protégé factor carried relatively little weight compared to the subfactors discussed above in Section IV.A. See AR 173. CMI was rated Marginal based on the Agency's finding of two significant weaknesses and no strengths. AR 1527–28. In contrast, the offerors that were included in the competitive range were both rated Outstanding for this subfactor based on the Agency's identification of one strength for FCi, AR 1532, and three strengths for USIS, AR 1548.

Participation in the Mentor-Protégé Program was not mandatory, AR 1509, but CMI planned to participate in the program. While CMI did submit a copy of its Mentor-Protégé Agreement with its proposal, it did not submit the required OSDBU approval letter until ten days after the date it was due. AR 1405–06.

In its analysis of this subfactor, the Agency awarded two significant weaknesses to CMI. AR 1527. The evaluators found that CMI's proposal did not contain the approval letter as required by the RFP, and the agreement that it did submit lacked official approval at the time of CMI's submission, also in contravention of the RFP's requirement. AR 1527. Based on these two significant weaknesses, CMI received a Marginal Rating. AR 1528. CMI's rating was consistent with the RFP's definition for this adjectival rating under this subfactor.

CMI argues that instead of a Marginal rating, for this subfactor, it should have been rated Neutral at worst, because offerors choosing not to participate in the program were assigned a rating of Neutral under the scoring criteria. AR 1509. CMI adds that the

BEC evaluators and the contracting officer had actual knowledge of CMI's registration to participate in the program and its anticipated receipt of the official approval letter, which it forwarded promptly to the Agency ten days later.  See AR 1526.[10]

The BEC evaluators determined that the approval letter should have been included in the original proposal.  But, it was not, and the evaluators noted, without further explanation, that "it [could not] be considered at this [late] time."  AR 1526.

Although the Agency failed to offer more than a summary reason for its refusal to consider the untimely approval letter when it evaluated this subfactor for CMI, a review of the evaluations shows that the Agency identified weaknesses in CMI's proposal as required by the evaluation criteria set forth in the source selection information.  As stated in the rating information, an offeror's proposal under this subfactor would be evaluated on the basis of:  whether the proposal included the signed letter of approval, whether the proposal included the actual agreement between the mentor and protégé, and the degree to which the mentor utilized the protégé in a meaningful way.  AR 1509.  In its proposal, CMI did indicate that it would participate in the mentor program and did describe how the proposed protégé would be utilized.  But its failure to submit the signed approval letter with its proposal put CMI's proposal squarely within the range of a Marginal rating, as defined by the solicitation.  See AR 1514 (A rating of Marginal applies when "Offeror is participating in the Mentor-Protégé program; however the proposal does not include one or more of the following:  OSDBU letter of acceptance, the agreement, or description of how the Protégé will be used in a meaningful way. . . .").

It was thus rational for the evaluators to find weaknesses in CMI's proposal based on its failure to submit either a timely signed approval letter or a certified agreement.  And consistent with the pertinent adjectival rating, CMI's Marginal rating was rational.  Perhaps more importantly, however, even if the court were to find error in CMI's rating as Marginal rather than as Neutral or Acceptable, such finding would be unlikely to have changed CMI's rating for Subfactor Two overall.  Because CMI received a rating of Marginal for Subfactor One under this factor, it rather likely would have received a rating of Marginal overall for Factor Two.  See, e.g., AR 1516 (USIS overall rating of Marginal for Factor One based on ratings of Marginal for Subfactor One, Outstanding for

---

[10]      Plaintiff attached a communication from DHS regarding its approval to participate in the program with its proposal.  AR 1526.  A DHS Small Business Advocate advised CMI that, "[t]he [CO] normally gives the mentor a sufficient amount of time to furnish the approval letter if it is not in [its] proposal.  I am contacted by the CO directly if [he or she] require[s] additional information [on] the status of a mentor-protégé application."  AR 1526.  Plaintiff reported that the communication was dated March 11, 2013.  AR 1526.  Plaintiff submitted its proposal without an approval letter on April 1, 2013, but forwarded the letter on April 11, 2013, after its receipt.  See AR 1526.

Subfactor Two, and Acceptable for Subfactor Three). CMI's rating of Marginal for Factor Two was rational.

>    C.    There Was No Disparate Treatment Among Offerors

CMI contends that it suffered unfair and disparate treatment relative to the two offerors in the competitive range, in violation of FAR. Pl.'s Opp. 11–13. The Agency allegedly "unfairly scored CMI's past performance [Factor Three] and [relevant] corporate experience [Factor One, Subfactor Four], by awarding strengths to the other offerors but no corresponding strengths and some weaknesses to CMI for the same issues."[11] Pl.'s Opp. 11. CMI also complains that the Agency expressed a willingness to overlook inadequacies in its competitors' proposals, but did not express the same willingness with respect to CMI's proposal. Pl.'s Opp. 13.

The FAR requires "integrity, fairness, and openness" in procurements conducted under the Federal Acquisition System, FAR § 1.102(b)(3), and specifically prohibits "[g]overnment personnel involved in the acquisition [from engaging] in conduct that . . . [f]avors one offeror over another," FAR § 15.306(e)(1). Unequal treatment between offerors is unreasonable and grounds for sustaining a protest. See, e.g., BayFirst, 102 Fed. Cl. at 686 (finding an agency acted unreasonably when, for example, it assessed a strength to the awardee but did not assess a similar strength for similar facts to the protestor).

>    1.    Relevant Corporate Experience Ratings

CMI argues that the Agency awarded one of its competitors (FCi) a strength under Relevant Corporate Experience (Factor One, Subfactor Four), which CMI contends it deserves as well. Pl.'s Opp. 12. FCi earned its strength based on its operation of the

---

[11]    It is unclear from CMI's submissions whether it also raises a disparate treatment argument with respect to its rating under Factor Three, Past Performance. See Pl.'s Opp. 10–11. CMI cites Factor Three in its disparate treatment argument, Pl.'s Opp. 11, and it uses the "past performance" terminology of Factor Three interchangeably with the "relevant corporate experience" terminology of Factor One, Subfactor Four, Pl.'s Opp. 10–11. This mixed use of terminology can be understood given the factors' overlapping inquiries. Compare AR 157-58, with AR 163-65. The court notes, however, that CMI received the highest possible rating of Low Risk under Factor Three, Past Performance, which suggests there is no need for CMI to challenge this rating. See AR 1568–71 (TEC analysis of CMI's Past Performance); see also Def.'s Reply Pl.'s Opp. (Def.'s Reply) 9, ECF No. 17 (arguing that "CMI received the highest possible rating – Low Risk – for the third factor evaluated, Past Performance. AR 1561. Therefore, CMI's claim that 'USCIS unfairly underscored' CMI under the Past Performance factor is wrong and cannot form the basis for any 'unreasonable disparate treatment' claim.") (quoting Pl.'s Opp. 11).

current FOSS contract as prime contractor for an eight-month period, during which it "consistently exceeded acceptable quality levels (AQL) on 70 percent of the metrics." AR 1450.  But, the Agency failed to award a similar strength to CMI for its past successful performance ratings despite CMI having received a higher AQL performance rating (99.64%) for a much longer period of time (six years) on essentially the same contract (RSS).  AR 1437–38 (listing no strength for AQL performance rating); but cf. AR 611, 619, 716, 718 (technical proposal) (disclosing past successful performance ratings as prime contractor on prior RSS contract).  CMI adds that the Agency similarly ignored CMI's positive performance (98.99% AQL) as a major subcontractor on a current NBC contract.  Pl.'s Opp. 12; see also AR 613, 675 (CMI's technical proposal) (disclosing past successful performance ratings as subcontractor on current NBC contract).

It is difficult to reconcile the Agency's assignment of a strength for positive AQL ratings to FCi with its denial of a strength for CMI's similar positive AQL ratings.  Cf. BayFirst, 102 Fed. Cl. at 686 (finding failure to award strength to protestor despite its submission of resumes with requisite experience, similar to the awardee's submissions, constituted either disparate treatment of offerors or an irrational evaluation of the protestor and awardee's proposals).  FCi's AQL ratings were lower than CMI's AQL ratings, and were earned over a shorter period.  Yet, the Agency evaluated FCi's experience more favorably.  Although the Agency might have had an explanation for its differing assessments, the Agency failed to document, in the record, either its rationale or sufficient facts from which the court might infer its rationale.  Cf. id. at 684 ("The court will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

Nonetheless, the court cannot conclude that the Agency's error in evaluating CMI's proposal in this area translates to an error in CMI's rating for this subfactor.  Even if CMI enjoyed an additional strength, its Acceptable rating would still be a rational finding.  An award of an additional strength would comprise only one small part of the Agency's highly discretionary subfactor ratings assessment.[12]  This is particularly true for this subfactor, as Relevant Corporate Experience encompasses more than a showing of

---

[12]    It is an even smaller part of the Agency's highly discretionary overall Factor One rating, of which this fourth subfactor (Relevant Corporate Experience) is the least important of all the subfactors.  See AR 567.  Moreover, as set forth in this opinion, the ratings for each of the three more important subfactors would remain the same.  See discussion supra Part IV.A.1–3.  CMI's first two subfactor ratings (both Acceptable) are also a step below the lowest offeror in the competitive range (who received two Good ratings) and two steps below the top contender in the competitive range (who received two Outstanding ratings).  AR 1409.

past successful performance; it also includes an in-depth analysis of the skills and experience demonstrated in that performance. See AR 1413–14 (listing nine experience indices). In this case, FCi's Good rating was based on the Agency's finding that FCi had three strengths, whereas CMI still would have only two strengths if CMI were awarded a strength for its positive AQL performance ratings. Compare AR 1449–50 (TEC's findings regarding FCi), with AR 1437–38 (TEC's findings regarding CMI). Moreover, the competitor submitted two examples of contracts in which it served as prime contractor, consistent with the solicitation's instructions requesting prime contractor experience. See AR 1449–50 (explaining FCi was the incumbent prime contractor on the current FOSS contract and had been the prime contractor on a now expired National Maritime Center contract). In contrast, CMI submitted only one example of a contract for which it served as a prime contractor, which was the RSS contract (the FOSS predecessor contract) that expired more than three years ago, and one example of a current contract for which it served as a subcontractor.[13] AR 718–20, 1437.

Notwithstanding this difference in the number of prior and present contracts, CMI correctly notes that it "would [have been] 'eminently reasonable'" if the Agency had given CMI more credit for its experience on the prior contract than the Agency gave FCi for the latter's "less success over less time" on the current contract. See Pl.'s Opp. 10. This court has found that "'[a]n agency . . . can give more weight to one contract over another if it more relevant to an offeror's future performance on the solicited contract.'" Plasan N. Am., Inc. v. United States, 109 Fed. Cl. 561, 573 (2013) (quoting Forestry Surveys & Data v. United States, 44 Fed. Cl. 493, 499 (1999)). Thus, consistent with

---

[13]     The government also argues that "CMI waived [its] 'disparate treatment' argument because [CMI] failed to raise [the] argument in its motion for judgment on the administrative record." Def.'s Reply 10 (citing, e.g., Quest Gov't Servs, Inc. v. United States, 112 Fed. Cl. 24, 36 (2013)). The government is correct only insofar as it pertains to CMI's first use of the phrase "disparate treatment" in filings subsequent to its motion. See Pl.'s Opp. 11–13. But, included in CMI's motion was the assertion that the CO had denied CMI the opportunity to clarify, correct, and improve its proposal through discussions, which opportunity CMI's competitors enjoyed once the Agency defined the competitive range for the procurement. See, e.g., Pl.'s Mot. 5, 6. Effectively CMI presented a disparate treatment argument in its motion, without labeling it as such. CMI expressly argued "disparate treatment" in its opposition to the government's cross-motion for judgment on the administrative record. See Pl.'s Opp. 11–13 (also serving as CMI's reply in support of its own motion). The court will not fault CMI for raising all available reasonable arguments in defense of a dispositive motion pending against it where, as here, the government had constructive notice of the arguments from earlier briefing and responded to the arguments in its reply. See Def.'s Reply 9–12; see also Quest, 112 Fed. Cl. at 36–37 (considering arguments raised for the first time in a reply because the opposing party had an opportunity to respond in writing and at oral argument).

CMI's reasoning, it was equally as reasonable for the Agency to have credited FCi's experience over that of CMI if the Agency found that the former's experience was more relevant or valuable. The court does not sit as an arbiter of reasonableness, but rather to determine whether the Agency acted arbitrarily, capriciously, or outside the law, which it did not. The court cannot find, as a matter of law, that an additional strength would have, and should have, improved CMI's Relevant Corporate Experience rating from Acceptable to Good.

2.      Opportunity to Correct or Improve Proposals

CMI contends that disparate treatment also is reflected in the Agency's willingness to overlook inadequacies and missing information in the proposals of its competitors (USIS and FCi), but not in CMI's proposal. Pl.'s Opp. 12–13. CMI points to the Good and Outstanding ratings its competitors received for Relevant Corporate Experience despite the Agency's admission that these offerors' proposals failed to effectively validate their claimed experience.[14] Pl.'s Opp. 12; see also AR 1409 (TEC table of ratings and reference to missing information). Nevertheless, the Agency overlooked the lack of validation; endorsed the offerors with high ratings despite the missing authentications; and reserved the right to adjust the ratings downward later if the two offerors subsequently failed to validate their experience in discussions reserved for the competitive range.[15] AR 1409.

CMI asserts that the Agency did not evince the same willingness to overlook any of CMI's purported weaknesses or missing information. See Pl.'s Opp. 11. CMI provides no specifics, in its "disparate treatment" argument, regarding what information it would have wanted the Agency to overlook in its proposal until competitive range discussions. See Pl.'s Opp. 11–13. From CMI's submissions, however, the court understands CMI's complaint to be that it was not given the benefit of the doubt with respect to the missing Mentor-Protégé letter (Factor Two, Subfactor Two) in its business

_____

[14]    Specifically, TEC acknowledged in its report (as a note appended to its ratings) that to advance the two top offerors (USIS and FCi) to the competitive range, the offerors "were rated Good or better for Corporate Experience" despite having failed to "identify whether [i] they and their subcontractors actually performed the contracts they cited for corporate experience as the prime contractor, [ii] whether the corporate entity that performed the contract is the same corporate entity as the offeror submitting the proposal on this RFP rather than a parent, subsidiary or affiliated company, or [iii] whether the resources of a parent, subsidiary or affiliated company will affect the performance of the offeror." AR 1409.

[15]    "These ratings are subject to adjustment in the event the Government establishes a competitive range and enters into discussions with these offerors to validate the cited corporate experience." AR 1409.

proposal, or the opportunity to clarify, correct, or improve other aspects of its business proposal.  See Pl.'s Opp. 13–15.

CMI's charge cannot stand because it seeks to compare different Agency actions akin to an apples to oranges comparison—specifically, the Agency's purported willingness to overlook its competitors' weaknesses in their technical proposals to the Agency's purported failure to overlook CMI's weaknesses in its business proposal.  The TEC and the BEC, however, are comprised of different evaluators who engage in independent evaluations within their relative areas of expertise.  See AR 561.  There is no indication in the record that they are privy to the other's evaluations, nor that they are affected or bound by them.  See Def.'s Reply 10 (asserting that TEC does not see the offeror's business proposal).

In any event, even if CMI had been given a higher rating on Factor Two, Subfactor Two based on the assumption it would address the Mentor-Protégé issue in the competitive range discussions, a higher rating under this subfactor would not have been sufficient to push CMI into the competitive range as its ratings under the most important factor, Factor One, remain the same.  See discussion supra Part IV.A.  Moreover, even if CMI were afforded the opportunity to improve other largely unspecified aspects of its business proposal during the competitive range discussions, the improvement would not translate to a higher rating for Factors Three and Four because CMI has already received the best possible rating of Low Risk for the other principal business factor (Factor Three) and has already quoted a highly competitive price (Factor Four).  AR 1820.

The court is not persuaded that the Agency treated the offerors disparately, but even if it did, there has been no prejudice.

> D.     CMI Was Not Prejudiced by the Agency's Competitive Range
>        Determination

The court has determined that, in spite of the various shortcomings and harmless errors in the Agency's approach, the Agency's evaluation of CMI's proposal was rational in the areas challenged by CMI.  See discussion supra Part IV.A–C.  When no arbitrary action is identified in an Agency's decision, the court does not reach the question of whether CMI was prejudiced by the outcome; the appropriate inquiry is whether any error was prejudicial.  See Bannum, Inc., 404 F.3d at 1351.  Prejudice means that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." Data Gen. Corp., 78 F.3d at 1562.  The court nonetheless considers CMI's arguments of prejudice, as set forth below, in an effort to address completely and directly the issues CMI has raised.

CMI argues that the Agency's underrating of its proposal prejudiced it "because but for USCIS' irrational, arbitrary, and unsupported evaluation of [CMI's] Proposal, [it] would have been included in the competitive range . . . , participated in discussions, and

had a substantial chance to receive the contract award."  Pl.'s Opp. 19; Pl.'s Mot. 2, 25, 39–40.  Namely, CMI claims that the "resulting corrections would 'be more than adequate to bridge the . . . gap,'" between CMI and USIS and FCi in the competitive range, "especially because CMI's proposal was highly competitive on both Past Performance (receiving the best possible 'Low Risk' rating) and on Price (evaluated at the second lowest price of the highest ranked offerors)."  Pl.'s Mot. 40 (internal quotation marks omitted).

As set forth in the record, the CO found the following with respect to Factors One through Four:

| Offeror | (1) Management Capability | (2) Small Business Subcontracting | (3) Past Performance | (4) Price |
|---------|---------------------------|-----------------------------------|---------------------|-----------|
| CMI | Acceptable | Marginal | Low Risk | $233,057,116 |
| FCi | Good | Outstanding | Low Risk | $227,068,333 |
| USIS | Outstanding | Marginal | Low Risk | $245,840,886 |

AR 1820.

CMI contends that if, for example, its "Factor [One] is corrected simply to a rating of 'Good,' that places CMI at the same technical evaluation level as FCi, but with a lower price, and thus justifies CMI's inclusion in the competitive range . . . ."  Pl.'s Opp. 1 (citing AR 1783–84).  Likewise, if it were elevated to "Outstanding," it would be on par with USIS, the most highly rated offeror.  Id.

CMI adds that had it been properly included in the competitive range, it would have been entitled to discussions with the Agency during which it could have made clarifications, corrections, and additional disclosures that likely would have further improved its ratings.  Pl.'s Opp. 13.  In support of its assertions, CMI points to the CO's admission that "[i]f . . . CMI [were] part of the competitive range, [its] DHS Mentor–Protégé approval letter [would] be considered."  AR 1526.  Thus, CMI claims that its "'Marginal' rating would have been thrown out, and [it] would have [had] a substantially higher rating for Factor [Two]."[16]  Pl.'s Opp. 15.

---

[16]    Similarly, CMI contends that the "numerous [alleged] errors and omissions with CMI's business proposal . . ." pertaining to Financial Capability, Labor Rate Detail Spreadsheet, Total Compensation Plan, and Full Time Employees Calculations, which

The government contends that CMI suffered no undue prejudice as a result of its exclusion.  The government points to the multitude of weaknesses identified by the Agency, including some not challenged by CMI, and the CO's discretion to weigh strengths and weaknesses, to negate CMI's claim that it belonged in the competitive range.  See, e.g., Def.'s Mot. 34.  The government avers that, even if one or two of CMI's weaknesses were diminished in degree or converted to strengths, CMI has failed to show on this record that its overall rating would have increased sufficiently to render it part of the competitive range.  Def.'s Mot. 34–36.

The government adds that because the Agency did not conduct any discussions with any offeror prior to the competitive range determination, the lack of discussion with CMI prior to such determination was not prejudicial to CMI.  Def.'s Reply 12.  Nonetheless, "even if discussions were held with CMI, given (1) its lack of more recent, relevant experience managing a contract as large as the FOSS as the prime contractor, (2) its lack of existing corporate infrastructure, and (3) the uncertain status of its only two proposed Key Personnel . . ., CMI failed to demonstrate that its rating [was] likely to change as a result of discussions."  Def.'s Mot. 35.  The government continues, asserting that:

> given the technical superiority of the offerors remaining in the competitive range, [CMI] would still not be likely to receive the award.  Accordingly, the [CO's] decision not to seek clarifications from CMI was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Def. Mot. 38.  The court agrees with the government.

CMI's overarching rationale for arguing that it was prejudiced is that it should have been given a higher rating under Factor One—specifically a rating of Good instead of Acceptable.  But the court has determined that the Agency's rating of CMI was rational for Factor One.  See discussion supra Part IV.A.  Agencies have broad discretion in determining the competitive range.  Birch, 4 F.3d at 973.

CMI has focused on the discussions it could have had with the Agency and the clarity that might have come from its explanations.  But, as the court has explained, the Agency had no obligation to conduct discussions with offerors not included in the competitive range.  AR 573; see also FAR § 15.306(a)(3).  CMI had the burden of

---

the government addressed in its briefing, see Def.'s Mot. 15–20, Def.'s Reply 13–15, are irrelevant because the Agency already determined that CMI's evaluated Price was within the competitive range; nevertheless, CMI argues that these alleged inconsistencies or mistakes in CMI's proposal could have been resolved in discussions according to FAR § 15.610, see Pl.'s Opp. 16–17 (detailing responses).

presenting an adequate proposal.  See Westech, 79 Fed. Cl. at 296.  The court cannot find here that CMI suffered any prejudice from the Agency's actions.

V.     Conclusion

The Agency's ratings of CMI's proposal and decision to exclude CMI from the competitive range were rational and were not arbitrary, capricious, an abuse of discretion, or contrary to law.  CMI's motion for judgment on the administrative record is **DENIED**; defendant's cross-motion is **GRANTED**.  Consistent with this ruling, plaintiff's motion for a permanent injunctive relief is **DENIED**.  See Pl.'s Mot. for Permanent Injunction, ECF No. 4, filed Dec. 12, 2013.  The Clerk of Court shall enter judgment for the government.  No costs.

IT IS SO ORDERED.

s/ Patricia Campbell-Smith
PATRICIA CAMPBELL-SMITH
Chief Judge